The Trenton Passenger Railway Company
(Consolidated)

*v.*

Samuel K. Wilson.

1. P. and W. were the owners of the majority of the shares of the Trenton
Horse Railroad Company, and determined to buy the entire stock of the City
Railway Company and form a consolidated company. W. agreed with P. to
advance the amount necessary to purchase the City company, the sum to be
repaid to him in cash from the sale of the bonds of the consolidated company.
P. agreed to turn over to W. the stock of the City company, as fast as pur-
chased, as further collateral for the money advanced for such purchase of
stock, the stock to be returned to P. as soon as the advance by W. was repaid.
W. advanced the money, and the consolidation was effected, the agreement
of consolidation submitted to the stockholders providing that the stock of the
companies consolidated should be convertible to the stockholders of the Tren-
ton company share for share, to the shareholders of the City company at the
rate of $14\frac{164}{225}$ shares of consolidated stock for each share of the City stock. The
agreement also provided for the payment of the debts of the two companies.
At the meeting of the stockholders and directors of the consolidated company
the day of the filing of the agreement, there was no disclosure by either W. or
P. to the other stockholders that there was between them any contract on
terms different from those specified in the agreement. Immediately after the
consolidation P. assumed control, and, on the books, charged the railroad com-
pany with the amount due W. for cash advanced, and thereafter issued to W.
a note of the consolidated company for the amount of his advances secured by
bonds of the company, which bonds W. thereafter sold and applied the price
on his debt.—*Held*, that the secret agreement between P. and W., providing
for other terms of consolidation, was not binding on the consolidated company
(*P. L. of 1888 p. 74*), under which the consolidation was effected, prescribing
that the agreement of consolidation should provide the manner of converting
the capital stock into the new corporation, and that the agreement should be
taken to be the agreement and act of consolidation of the companies.

2. It is immaterial whether the repayment for advances for the purchase of
the City stock was made to W. as the owner of such stock or as creditor of the
Trenton company; and the fact that P. entered the same as a debt on the
books of the consolidated company was not sufficient to create an indebtedness
in favor of W. if it did not, in fact, previously exist, as the acts of P., the sole
manager in control, were unknown to the other directors of the company,
except one director who was in the employ of W.

18

3. The fact that the consolidated company is the owner of the City property which was transferred to it, and that W. advanced money to purchase such stock on the faith of the agreement of repayment, and without this agreement would not have made the purchase, creates no equity as against the consolidated company.

4. That the suit by the company against W. for an accounting and for repayment of the money derived from the bonds is really brought for the benefit of P., who is a large stockholder, is no defence, as the corporation in such action represents the right of every stockholder.

5. That P. refused to pay over to W. the stock in the consolidated company does not create any equity in W. as against the consolidated company, so as to make it a condition precedent to the return of the money obtained by W. through the sale of the bonds that the company should transfer to him the stock issued in lieu of the stock of the City company purchased by his money.

On bill for accounting. Heard on bill, answer, replication and proofs taken orally.

This is a suit brought by the complainant corporation against a former director, based upon alleged illegal appropriation of the company's property and moneys, and the bill is filed for the purpose of obtaining a discovery and an accounting.

The complainant is a corporation formed by the consolidation of four other corporations, and the bill charges misappropriations of the funds of the consolidated corporation after the consolidation, and also of the funds of one of the constituent companies before the consolidation.

By the bill as amended, three separate misappropriations of complainant's own funds after the consolidation are charged— *first*, the sum of $1,900 taken on or about October 1st, 1891, at which time a note of the consolidated company for $130,000, payable to defendant, was also received by the defendant illegally as charged, and to secure which defendant, shortly after October 1st, 1891, received bonds of the company amounting to $260,000 ; *second*, the sum of $130,000 which was received by defendant, in payment of the note, from the company's funds produced by the sale of bonds sufficient for that purpose ; and *third*, the interest on this $130,000 received by the defendant, from October 1st, 1891, to September 1st, 1894, and paid from the complainant's funds, which interest amounts, as now appears

by the evidence, to about $24,000. The *fourth* claim set up in the bill as amended is that, in the spring of 1891 and before the consolidation, the defendant and Lewis Perrine (called ·in the bill a " purchasing syndicate "), who were both then directors of the Trenton Horse Railroad Company, one of the constituent companies, took from the treasury of the latter company, without authority, $25,053.08, subsequently returning $22,400 only, so that $2,653.08 is claimed to be due to complainant as succeeding to the rights of the constituent company. It now appears, however, that, according to complainant's statement of the account submitted on the argument, nothing is claimed to be due to complainant from defendant on this so-called purchasing syndicate account of the Trenton Horse Railroad Company, but that the defendant, on the contrary, is entitled to a credit on this account for a balance of about $3,300 due to him from complainant as successor to the Trenton Horse Railroad Company, which amount·is to be allowed him as a credit in the general account. The main question left in dispute at the hearing, as a result of the accounting, which has been taken as part of the evidence on the hearing, is, therefore, the defendant's liability to account for the funds of the complainant taken for the payment of the $130,000 note and interest thereon, and for the $1,900 in cash taken on October 1st, 1891. For the purpose of the present decision, I shall consider only this single question, leaving the other questions arising out of the accounting, and which are mainly matters of detail as to which there is no substantial dispute, to be settled hereafter, if the parties do not agree.

The material facts bearing upon this main question, as I find them to be established by the pleadings and proofs, are as follows:

Previous to January, 1891, the defendant and Lewis Perrine, Jr., together owned or controlled all of the capital stock of the Trenton Horse Railroad Company, one of the constituent companies, except sixty-six shares. The entire stock of this company was one thousand four hundred and forty-four shares, of $25 each, amounting to $36,100, of which defendant owned three hundred and sixty-three shares, and one thousand and

fifteen shares were held by Lewis Perrine, Jr., and his family, as follows: Lewis Perrine, Jr., five hundred and forty-eight shares; Addie Slack Perrine, wife of Lewis Perrine, Jr., one hundred and twenty-eight shares; Henry P. Perrine, his brother, one hundred and eighty-two shares, and Mrs. Mary A. Bell, a sister, one hundred and fifty-seven shares. The remaining sixty-six shares were held by twenty-three persons or estates, the largest single holding being ten shares. The company had a bonded debt of $100,000, the defendant, Wilson, holding about $25,000 of these bonds. It had, besides, a considerable floating debt, and the stock would probably not have brought over $5 a share. The defendant was a man of large means, and had been in the habit of rendering financial assistance to the Trenton company by loans and otherwise. The City Railway Company, to some extent a rival or competing company, had been organized, and was then also operating its road in Trenton. Lewis Perrine, Jr., who, since the death of his father, General Lewis Perrine, some years previous, had been in charge of the management of the Trenton company, about January, 1891, conceived the plan of bringing about the consolidation of the Trenton and City companies by the purchase of the entire stock of the latter company ($90,000 par value), and then forming a consolidated company, which should take in these two companies, and also two minor companies, the Hamilton company and South Clinton company, which were, in fact, mere adjuncts or extensions of the Trenton company, and had been constructed by it from its own funds and for which stock had never been actually issued. The equipment of the road electrically was a part of the plan proposed in connection with the consolidation. Perrine, who was himself without the means or credit necessary for this purpose, applied to defendant for his assistance, and after several consultations, an agreement, in writing, was made between them on March 23d, 1891, relating to the consolidation, and a supplement thereto was signed by both on March 28th, 1891. These agreements are set out in full in the defendant's answer, and at this point I shall only state their general effect, so far as they bear upon the main question now in issue, viz.,

the liability of the consolidated company to pay Wilson the $130,000, and his right to receive it from the funds of the consolidated company. By the agreement of March 21st, 1891, which was an agreement between Wilson and Perrine as individuals, the scheme of consolidation adopted was the organization of a company with $1,500,000 capital stock, and the company was also to issue at once bonds to the amount of $1,000,000, $190,000 of which were to be used to pay off the bonded indebtedness of the Trenton and City companies already existing; $300,000 to be divided among the four principal owners of the Trenton company in proportion to their stock, Lewis Perrine, Jr., Samuel K. Wilson, H. P. Perrine and Mary A. Bell, and $510,000 of bonds were to be offered for sale to the public or pledged with some trust company for advances to equip the companies electrically and repay Wilson $135,000 advanced by him in cash to buy the City Railway Company. The entire stock of the consolidated company was, by the agreement, to be divided between Wilson and Perrine, the latter receiving $760,000, a controlling interest, Wilson $500,000 for advancing the $135,000 in cash to buy the City Railway Company, and the remaining $240,000, or so much as was not needed to float the bonds to be offered to the public, was to be equally divided between Perrine and Wilson. During the negotiations, as Wilson swears, Perrine had proposed that a portion of the stock of the consolidated company, also, should be divided among the four principal owners of the Trenton company in addition to the bonds, but he, Wilson, refused to consent to this, and a provision in the agreement dividing $150,000 of stock among these owners was stricken out before signature. No provision was made in either of the agreements for any portion of the stock of the consolidated company being issued to any of the shareholders of the Trenton company. On these terms Wilson bound himself to advance in cash $135,000 to purchase the City Railway Company,

"said sum to be repaid to him in cash out of the proceeds of the first sale of the bonds, hereinbefore provided for, or for bonds above at par at his election, and he [Wilson] agrees to render such other financial assistance as may be necessary, either by advances of money or endorsement of notes of accommodation as he may deem necessary, and as he may be willing to do."

Perrine, on his part, " hereby agrees to complete said consolidation and manage property, and to join with Wilson in all notes " &c., assuming one-half liability in the premises, and the following provision is added as to Wilson's further security :

"Said Lewis Perrine, Jr., further agrees to turn over to Samuel K. Wilson the stock of the City Railway Company as fast as the same is received and paid for, as further collateral for aforesaid advance of $135,000; said stock to be returned to said Lewis Perrine, Jr., as soon as said advance of $135,000 as aforesaid is returned and repaid to Samuel K. Wilson, or otherwise liquidated to his, the said Wilson's, satisfaction."

By the supplementary agreement of March 28th, 1891, provision is made for a further division of bonds, $100,000 each to Wilson and Perrine, and also for Perrine's consultation with Wilson in regard to expenditures, improvements and extensions, which are to be mutually agreed on, and Perrine's salary as general manager of the consolidated company is fixed at $5,000. Upon the execution of this agreement, the parties proceeded to the purchase of the City railway stock, operating for that purpose through a negotiator or promoter, Mr. L. B. French, in order that the holders of the City stock might not know that the purchase was made in the interest of the rival company, and on this account increase their demands for the stock.

French consummated the purchase by an agreement with Mr. Skirm, acting for the owners of the City stock, and the price to be paid was $125 per share for the entire nine hundred shares ($112,500), besides the payment of the floating debt of the City company, to the extent of $34,000, and Skirm agreed to deliver at least seven hundred shares. All excess of the debt over $34,000 was to be paid by the holders of the City stock, and the entire amount to be paid by the purchasers therefor, on this basis, was $146,500, besides French's compensation, which seems to have been about $15,500 more. On March 27th, 1891, defendant advanced directly to French for the purchase, $75,000, and on April 2d, 1891, $47,400 additional—in all, $122,400. From the payment to French of $47,400, which was made by Wilson's check, French took out $12,500 in cash (which he retained, apparently, on account of his compensation), and on

April 4th, 1891, he paid to Skirm, by his own checks, the balance, $109,900, and Skirm then delivered at least six hundred shares of the stock to French. Seventy-five thousand dollars of this amount was received, as Mr. Skirm says, in payment for six hundred shares of the stock, and $34,900 to pay the debts of the City company, a large part of which ($22,400) was in the form of notes upon which he (Skirm) was personally responsible. Twenty-two thousand four hundred dollars of this City company indebtedness was settled on April 4th, 1891, as appears by the books of the City company, but the books of the Trenton company do not show that it was connected with this transaction of payment of the debts of the City company. The money advanced by Wilson being thus, to the extent of $47,400, used for the payment of the debts of the City company and the expenses of the purchase, further sums were necessary for the purchase of the stock and to satisfy French in full, and this money was raised by payments made by the Trenton Horse Railroad Company, all of which appear on its books as charges to " expense of City railway purchase." On April 30th, 1891, the Trenton company, by Perrine as president, gave its note to French for $3,153.15, in full settlement. The Trenton company also, on May 1st, 1891, discounted three of its notes, all made by Perrine as president and endorsed by Wilson, and amounting, together, to $18,500. Wilson, on this day, also gave his check to the Trenton company for $7,500, and from the $26,000 so derived, the Trenton company, on May 2d and May 4th paid to Skirm, by its checks, $25,000 on account of the balance due. As the indebtedness of the City company exceeded $34,000, and an adjustment of the purchase price was therefore necessary, this was settled between Perrine and Skirm, and on May 1st, 1891, it was settled by a note for $5,967.80, given to Skirm in full settlement. This was a note of the Trenton company, endorsed by Wilson, and the only note not endorsed by Wilson in these transactions in which the Trenton company's notes were given, was the note for $3,153.15, given by the Trenton company to French. The latter note was paid at maturity, from the funds of the Trenton company, but all

Trenton Pass. Ry. Co. *v.* Wilson.

of the other notes (the $18,500 note and the $5,967.80 note, amounting to $24,467.80) were renewed (with Wilson's endorsement) from time to time by the Trenton company until the consolidation, and then by the consolidated company, which finally paid all of these notes from its own funds. At the time of the consolidation, these four notes were carried on the books of the Trenton company, as liabilities of the Trenton company, and the purchasing syndicate, on its books, was charged with $34,553.08 as the expense of purchasing the City railway, this including the $25,000 paid to Skirm, the note of $5,967.80, besides discount and minor expenses, amounting to $430.13. The final result of the purchase of the City railway, so far as relates to the amount paid and the sources of payment, is as follows:

Amount required for entire expenses of purchase of stock and expenses as follows:

| | | |
|---|---:|---:|
| Nine hundred shares of stock, $125 per share | $112,500 | 00 |
| City company debt to be paid | 34,000 | 00 |
| French's compensation retained from Wilson's check | 12,500 | 00 |
| Note to French in settlement | 3,153 | 15 |
| Discount on notes &c | 430 | 13 |
| | $162,583 | 28 |

The ultimate sources of payments of these accounts, according to the evidence, seem to have been as follows:

Paid by S. K. Wilson as follows:

| | | | |
|---|---:|---:|---:|
| Directly to French | $122,400 | 00 | |
| Paid to Trenton company | 7,500 | 00 | |
| | | | $129,900 00 |
| Paid by consolidated company after consolidation, being notes of Trenton company previously given. | | | 24,467 80 |
| Balance paid from funds of Trenton company before consolidation or by consolidated company after consolidation.. | | | 8,215 48 |
| | | | $162,583 28 |

The evidence shows that the two sums of $3,153.15 and $430.13 were paid from the funds of the Trenton company before consolidation, but the exact amount paid by it in addition

has not been satisfactorily shown, probably for the reason that the basis of arriving at the amount of the note given on adjusting the payments of the excess of the debt of the City company above $34,000 does not appear. The total amount which, by the books of the Trenton company, seems to have been paid by it on account of the purchase and charged to the purchasing syndicate, is $34,553.08, and this, if correct as to the amount, shows that the payments made by the funds of the Trenton company, before consolidation, were $1,870.80 more than the balance above stated.

After the purchase of the City company stock the City road was managed by Mr. Perrine from the offices of the Trenton company, and he had entire charge of both roads. Perrine, upon the purchase of the City stock, had all the shares transferred to his name instead of Wilson's, and remained the sole owner of the shares upon the City company's books at the time of the subsequent consolidation. These shares were, however, actually delivered to Wilson subsequent to the purchase, but the date of delivery is shown only by Wilson, whose statement is that they were delivered during the summer or fall of 1891, and that he is not certain whether they were delivered before or after the consolidation. During the summer of 1891 Wilson assisted the Trenton company by a further loan of $2,000, which was advanced for its running expenses. For this latter amount and also for the $7,500 advanced to the Trenton company on May 1st, 1891, to complete the purchase of the City stock, Wilson appears on the books of the company as a creditor, but there is no entry to his credit of the $122,400 advanced to French. An account called "expense of city railway purchase" was entered on the books of the Trenton company, which were kept under Perrine's direction, and this account is charged on September 30th, 1891, with $34,553.08, and on the latter date the account is transferred to an account called "purchase syndicate," who are charged with this amount ($34,553.08) as "cash and notes of Trenton Horse Railroad Company applied to purchase of the City Railway Company." These accounts were opened by Perrine's directions, and none of the money of the Trenton company which was applied for these purposes came to Wilson's

hands; and on the other hand, as above stated, he advanced to the company $7,500 of the funds which were so applied by Perrine. After the purchase of the stock Wilson seems to have left the practical carrying out of the consolidation to Perrine, the latter being a lawyer, and Wilson himself does not appear to have had other counsel or advice, either in relation to the agreement between Perrine and himself or as to the provisions in the consolidation agreement necessary for his protection, in relation to the repayment by the consolidated company of the advances he had made for the purchase of the stock of one of the constituent companies. These advances, to the extent at least of $122,400, did not appear upon the books of the Trenton company as a debt or liability of that company, nor did this company appear to be the purchaser of the City stock, and on the contrary, the "purchasing syndicate" were on the company's books debtors of the Trenton company instead of its creditors for money advanced to it by the company, or on its behalf, to purchase the stock. The *status* of the Trenton company at the time of the consolidation was, as shown by its books, simply that it was a creditor of the "purchasing syndicate" for over $34,500 advanced by it for the purchase of the City railway stock, and had, so far as appeared by its books, no ownership of a right to the stock so purchased.

The consolidation was effected under the laws of February 21st, 1888 (*P. L. of 1888 ch. 48 p. 74*), authorizing the consolidation of horse railroad companies, and of April 16th, 1891 (*P. L. of 1891 p. 455*), permitting horse or other street railways to consolidate in the manner provided for the consolidation of horse railroad companies. The former act (*P. L. of 1888 p. 74 &c.*) provides the method of consolidation, which is to be by means of a joint agreement entered into by the directors of the several corporations, under the seal of the company, for the consolidation, and prescribing its terms and conditions, and among other things,

"the number of shares of the capital stock, the amount or par value of each share, and the manner of converting the capital stock of each of the said companies into the new corporation" &c.

Trenton Pass. Ry. Co. v. Wilson.

This agreement is to be submitted to the stockholders of each company at a meeting specially called on notice prescribed, and it is to be voted on by ballot of each company separately, and on the adoption of the agreement by a three-fourths vote, that fact is to be certified on the agreement by the secretaries of the respective companies under the seals of the companies. The agreement (or a certified copy) is then to be filed in the office of the secretary of state, and (section 1, subdivision 2) "shall from thence be deemed and taken to be the agreement and act of consolidation of the said companies." By section 3 of the act, on the consummation of the consolidation, all the franchises, property and rights of each of the constituent companies vest in the consolidated company, subject to creditors' rights and liens; and by section 7, the consolidated company is authorized to issue bonds sufficient to cover the indebtedness of the constituent companies, and to complete, reconstruct and better equip the railroads, securing the bonds by mortgage on its franchises, and these bonds may be given in satisfaction for the debts, on such terms as may be agreed on between the holders and the directors of the consolidated company. The agreement of consolidation in this case is annexed to the answer, and in reference to the terms of consolidation, provides as follows: *Sixthly*, that the capital stock of the consolidated company shall be $1,500,000, being fifteen thousand shares of $100 each; and *seventhly*, that the stock of the constituent companies is convertible as follows: To the shareholders of the Trenton Horse Railroad Company, fourteen hundred and forty-four shares, being share for share; the same to the shareholders of the Hamilton and South Clinton companies, two hundred and one hundred shares, respectively, and the balance, thirteen thousand two hundred and fifty-six, to the shareholders of the City Railway Company for their nine hundred shares in the latter, and being at the rate of $14^{164}/_{225}$ shares of consolidated stock for each share of the City railway stock. The agreement further (section 8) conveyed all the railroads, property, rights &c. of each company, and these properties, rights and franchises were accepted (section 9) subject to two debts specified, viz., the bonded debt of the Trenton

Horse Railroad Company for $100,000, and the like debt of the City Railway Company for $90,000. No other debts were specified as existing, but there was no express stipulation (except as to the Hamilton and South Clinton Avenue companies) that there were no other debts; and I am inclined to the view that the true construction of those two clauses taken together is, that the property conveyed was subject, by way of lien, to these debts, and not that these specified debts were to be understood as the only debts of any of the companies. No provision was made in these articles of consolidation that any payment, either in cash or bonds of the consolidated company, should be paid to any shareholders of the City Railway Company, upon the exchange of stock, either for advances paid to purchase this stock, or otherwise.

At the first meeting of the stockholders of the consolidated company, held on September 28th, 1891, after the adoption of the consolidated agreement by the constituent companies, the joint agreement for consolidation was adopted, with the terms, provisions and conditions therein contained, and directed to be filed, and shares of the capital stock of the consolidated company were directed to be issued in exchange for the shares of the constituent companies, as provided for in the agreement. At this meeting Perrine, Wilson and seven others were elected as directors for one year, and Perrine was elected president and Wilson vice-president for one year and until their successors were chosen. At the same meeting of stockholders resolutions were passed authorizing the consolidated company to borrow $1,000,000 and issue its bonds, secured by mortgage, to pay the indebtedness of the companies merged and consolidated, and to aid in the completion and equipment of its roads. Resolutions of a similar character, accepting the consolidation agreement, electing officers and authorizing the mortgage, were passed at a meeting of the directors of the consolidated company, held on the same day, September 28th, 1891, after the stockholders' meeting. Defendant was present at this meeting of the directors and voted for them, and I think the evidence establishes that he heard the agreement of consolidation read. He, however, denies

this. At this directors' meeting the stock of the consolidated company was authorized to be issued in exchange for the shares of the constituent companies, and the president was authorized to take the proceedings proper or necessary to effect the exchange or carry it out. The president's salary was fixed at $5,000 per year, and he was authorized to fix the salaries of the secretary, treasurer and the other employes and agents of the company. At meetings of the stockholders and directors of the consolidated company, held on September 30th, 1891, the day of the filing of the agreement, the action of the board of directors taken on September 28th, 1891, in reference to the issuing of the bonds and mortgage, was ratified. At this meeting of the board of directors the defendant seems to have been present and the mortgage was read. At no time during these proceedings for consolidation was there any disclosure, by either Wilson or Perrine, to the other stockholders or directors, that there was, between them, any agreement for consolidation upon terms different from those specified in the agreement or that any portion of the bonds of the consolidated company were to be issued, either to the holders of the City railway stock, in addition to their shares provided for at the rate of over fourteen to one, or that the amount advanced by Wilson for the purchase of these shares of one of the constituent companies was intended to be claimed as a debt of one of the other constituent companies which the consolidated company was liable to pay ; nor, on the other hand, does Wilson's attention seem to have been called by Perrine to the effect of the articles of consolidation, if adopted in this form, upon his right, as against the consolidated company, to require the performance of the terms agreed upon between himself and Wilson, especially in reference to the repayment out of the funds of the consolidated company of Wilson's advances for purchasing stock of a constituent company. Wilson evidently relied upon Perrine to protect him. Perrine, instead of inserting in the articles a provision for additional payment or for bonds to holders of the City stock, which would seem to be the only method in which such a vital and material point in the terms of consolidation could be reached at all, adopted the plan of treat-

ing these advances as a debt of the consolidated company, from the very outset, by entering the transactions upon its books as a debt due from the Trenton Horse Railroad Company to Wilson for advances made to that company previous to consolidation. Immediately upon the consolidation Perrine assumed complete control of the management of the company; its books were opened under his direction and control, and upon these books, at the outset and in the charges against "railroad and appurtenances," the total amount (including $1,500,000 capital stock) was $1,938,636.62. Among the items of charge is one for $131,900 due S. K. Wilson "for cash advanced T. H. R. R. Co. as follows: March 27th, 1891, $75,000; April 2d, 1891, $47,400; May 1st, 1891, $7,500; August 16th, 1891, $2,000; total, $131,900." The purpose of the advances is not stated on the books. Mr. Wilson, from this date, appears as a creditor on the books of the complainant for this amount, and about November 5th, 1891, he received from the complainant $1,900 on account of the principal of the advances, and $3,957 for interest on advances accrued to October 1st, 1891. *Voucher, Exhibit C 15.* On that date, November 5th, 1891, Perrine executed and delivered to Wilson the note in question for $130,000, as follows:

"$130,000.             TRENTON, N. J., October 1st, 1891.

" One (1) year after date we promise to pay to the order of Sam'l K. Wilson, at the banking house of the Trenton Banking Company, one hundred and thirty thousand 0-100 dollars, without defalcation or discount, value received.

" Interest at 6 per cent., payable semi-annually.

           "THE TRENTON PASSENGER RAILWAY CO.

                 "(CONSOLIDATED),

                 "LEWIS PERRINE, JR.,

                    *"President."*

The entire transaction was managed by Perrine alone, and was not brought to the attention of the board of directors or of any of the directors except Stokes, who was in Wilson's employ.

There was no concealment, however, of the transaction upon the books of the company, which, in Wilson's account, as well as in the other proper places, openly disclosed, from this time

forward, the payments on account of the note and the transactions relating thereto. At the time of receiving the note, Wilson held the nine hundred shares of the City railway stock which had been delivered to him, but he had not then received any shares of the consolidated company issued in exchange therefor. The shares of the consolidated stock issued in exchange for the Trenton, Hamilton and South Clinton company seem to have been issued substantially according to the agreement, viz., share for share to each stockholder of record or entitled to shares, and Wilson received his share of these. As to the City Railway Company, Perrine caused to be issued to himself $13.241^{61}/_{225}$ shares and to Wilson $14^{164}/_{225}$, the latter being the equivalent of a single share of the City railway stock. The agreement of consolidation provided that the shares of the consolidated company should be issued upon the surrender of the stock of the constituent companies, but all of the City railway stock was, at the time Perrine issued the stock to himself, in Wilson's possession, as collateral for his advances; and Perrine, who, under the resolution above referred to, was authorized to carry out the exchange of the stock, does not then appear to have requested Wilson to deliver the City stock or to have notified him that all of the new stock had been issued to him (Perrine). The City stock was held by Wilson for about a year, when it was delivered to Perrine under the circumstances hereinafter stated.

On January 20th, 1892, Wilson and Perrine, by a written agreement entered into between them individually, agreed that the first mortgage bonds of the company should be deposited with the Central Trust Company, the trustee under the mortgage, subject to their joint order or that of their legal representatives. Two hundred and forty bonds were delivered to the trust company under this order, and receipted for by the trustee.

On January 28th, 1892, Perrine, as president of the company, by letter of that date, requested the trustee to certify two hundred and sixty bonds on the order of Mr. Wilson, on presentation by him, with the statement that "these bonds have not been sold, but simply deposited with Mr. Wilson as collat-

eral for loan." After the receipt of this letter, the trust company seems to have held two hundred and sixty bonds subject to Mr. Wilson's order. In the meantime, and up to April, 1892, Perrine had undertaken, with the assistance of Wilson's credit, to equip the road electrically, and had, up to this time, equipped about one-half the road at a large expense, which was carried as an indebtedness of the consolidated road. But his efforts to market the bonds of the company under the mortgage of 1891, to meet this expenditure, were unsuccessful, and in order to raise funds to improve the security of the bonds, Perrine arranged with Gay & Stanwood, brokers, of Boston, to take the whole issue of $1,000,000 of bonds, at the price of $980 per bond of $1,000, but that new bonds and a new mortgage should be executed.

These agreements, which were in writing, were approved at a meeting of the directors of the company, on April 14th, 1892, at which defendant was present, and a new mortgage was authorized, substantially on the terms of the first mortgage, but with the provision added that the trustee after retaining $390,000 of the bonds to meet the underlying bonds of the Trenton and City companies ($190,000) and $200,000 for the purpose of constructing extensions of the road, should deliver the other bonds to the railroad company, upon delivery to it of a copy of a resolution of the board of directors, stating the number required and the purpose to which the proceeds were to be applied, which purpose was to be one of the purposes set forth in the resolution, viz., for paying the indebtedness of the companies merged or consolidated, and equipping the road; and the company agreed that the proceeds of the bonds so certified and delivered should be used only for the said purposes. After the execution of this mortgage and of the new bonds, Mr. Wilson, in May, 1892, received two hundred and forty of the new bonds, and these he delivered to the trust company, on or about May 7th, 1892; Perrine, as president, advising the trust company, by letter of that date, that these bonds "are pledged by our company to Mr. Wilson as collateral security for certain cash advances made by him to said railway," and requesting receipt to be issued to Wilson for

these and also for twenty bonds additional, making two hundred and sixty in all, as collateral. The company issued a receipt dated May 3d, 1892, to Mr. Wilson, stating that they held two hundred and forty bonds subject to his order and also acknowledged receipt from Wilson, of the two hundred and forty bonds originally issued and for which the new bonds were substituted. Some time after the bonds had thus been delivered to Wilson, and a year or more after he had received the City stock as collateral, Wilson delivered to Perrine the City stock at Perrine's request, and upon his statement, as Wilson says, that he wanted it to file to complete the papers of consolidation or to deposit in the state-house as part of the consolidation papers. On this statement, Wilson surrendered the City stock, retaining the two hundred and sixty bonds, but does not appear to have requested from Perrine the consolidation stock issued in exchange for the City shares, nor did Perrine offer to deliver these. From the time of this delivery up to August, 1893, no payments were made on account of the note, the whole proceeds of the sale of bonds to the brokers being needed for the equipment and purposes of the road, and the defendant, in addition, lent his credit to the road, by endorsements and guarantees, to a very large amount, and, in the aggregate, over $1,000,000 up to this time. On August 14th, 1893, the first payment was made from the complainant's funds on account of the $130,000, and the entire payments made on account of the note by complainant's checks directly to defendant, are as follows : August 14th, 1893, $3,000 ; September 9th, 1893, $7,000 ; November 6th, 1893, $15,000 ; February 1st, 1894, $15,000 ; February 5th, 1894, $10,000 ; March 5th, 1894, $10,000—in all, $60,000, paid by complainant's checks on its own funds, all signed by Perrine as president, and given directly to the defendant.

The balance of the money received by defendant upon the note was by checks or drafts of the General Trust Company for the proceeds of bonds held by it subject to the order of Mr. Wilson. Previous to July 16th, 1894, Wilson had returned to the company, or allowed it to receive, the proceeds of some of the two hundred and sixty bonds held by him as collateral and

19

in the trustee's hands, and on this date there were ninety-two bonds so remaining. By letter of July 16th, 1894 (*Exhibit C 13*), Wilson directed the trustee to deliver ninety-two bonds to Gay & Stanwood for $980 each, stating that the bonds were held by him as collateral, and requesting, therefore, to be advised of receipt of proceeds of sale. Perrine, as president of the complainant, added a postscript that "approved price of bonds was ninety-eight and interest from April 1st, 1894, to delivery." On the following day Wilson sent eight additional bonds to make up $100,000 of bonds for Gay & Stanwood. The source from which these eight bonds were obtained does not appear, but defendant's answer seems to admit that all of the bonds defendant realized on were part of the original deposit. Previous to these joint directions of Wilson and Perrine in reference to the disposition of these ninety-two bonds, differences had arisen between them in reference to financial matters, and before July, 1894, Wilson had apparently notified the trust company not to permit the company to draw the balance of funds in its hands as trustee to the credit of the company for the proceeds of sale of its bonds. These differences seem to have been adjusted and on July 2d, 1894, Wilson wrote a letter to the trust company requesting it to honor draft of the company for balance in the trustee's hands, "without disturbing bonds held by you for me as collateral, said bonds amounting to $92,000." This letter of Wilson's was enclosed to the trust company in a letter of Perrine's dated July 17th, 1894. The trust company, pursuant to Mr. Wilson's directions, sent the one hundred bonds to Gay & Stanwood, received from them the stipulated proceeds of sale, and from these proceeds of sale paid over to the defendant by its own checks to defendant's order $100,312.50, on the following dates: August 6th, 1894, $50,008.33; September 4th, 1894, $25,125, and September 15th, 1894, $25,179.17. None of this money was paid directly by the trust company to the complainant, but it was all received by Wilson from the trust company as proceeds of the bonds held by it subject to Wilson's order. The checks, however, appear on their face to be drawn on "Account of Trenton Pass. Ry.," and on "trust account," and

were paid and charged by the trustee to the bond trust account with the complainant. The last check, of $25,179.17, was more than sufficient to pay the balance of principal due on the note, after applying the previous payments, which balance was $4,866.67, and the difference ($20,132.50) was charged by the complainant on its books to Mr. Wilson in his personal account, on which there was then owing by the company to Wilson for loans about $10,500.

The interest paid to Mr. Wilson on the $130,000 note, from time to time, amounted in all, from November 4th, 1891, to July 2d, 1894, to $23,900.75, all of which seems to have been paid direct to Wilson from the funds of the company or to have been allowed to him as credits in his personal account. In September, 1894, serious differences arose between Perrine and Wilson in reference to the management of the road, and Wilson, in order to protect himself, as he says, then insisted upon a transfer from Perrine to himself of a majority of the stock of the consolidated company and refused further financial assistance or endorsement unless this was done. Up to June, 1894, Perrine held in his own name the entire stock issued in exchange for the City company stock except the single certificate issued to Wilson for 14 + shares, as the equivalent of one share of City stock. The bonds of the company having been floated without recourse to the stock, the entire stock of the company was, under the agreements between Wilson and Perrine, to be divided between them as follows: $760,000 to Perrine, $500,000 to Wilson and the balance, $240,000, not needed to float the bonds, to be equally divided between them. Perrine, on June 1st, 1894, without notice to Wilson or consultation with him, made a different division of the stock, giving Wilson at that time 4,551 + shares, and divided the entire balance, 8,689 + shares, between himself, his wife, brother and sister, he retaining 6,892. This division between the Perrines was not based on their proportionate ownership of shares in the Trenton company, but, so far as appears, was an arbitrary division by Lewis Perrine, without any money payment.

When Wilson demanded a control of the majority of the stock

in September, he did not know that this division had been made. In the latter part of September, 1894, the company was in financial distress, by reason of Wilson's refusal to continue his endorsements, and Perrine then informed Mr. Buchanan, the counsel of the company, of Wilson's receipt of the money from the sale of the bonds. Perrine, in company with the counsel of the company, at once visited Wilson at his residence, and the company's counsel then stated to Wilson, at Perrine's request, the effect of Wilson's withdrawing the money of the company, the statement, as made in both Perrine's and Wilson's presence, being that in view of what he (the counsel) knew about the origin and history of the bonds, they (Wilson and Perrine) had both been guilty of a crime, and were liable to punishment by imprisonment, and that in his (the counsel's) judgment, the only way to escape was to restore the money. The counsel also stated that unless the money was restored the company would go into the hands of a receiver. Perrine also told Wilson, after the counsel's proposition, that the only alternative to the proposition to restore the money was to continue to endorse, and Perrine threatened to break up the roads unless Wilson continued to endorse. Wilson refused to continue his endorsements unless a majority of the stock was transferred to him, and the parties separated. This demand for the return of the money made in Perrine's presence, and apparently by his direction, was the first intimation to Wilson that Perrine, either individually or as an officer of the company, repudiated the agreement between them, in reference to repaying Wilson for the advances he had made to purchase the City stock for the benefit of himself and Perrine. The demand for the return of the money was not accompanied by any offer on Perrine's part to return to Wilson the shares of stock in the consolidated company which had been issued to Perrine for the City stock purchased by the use of Wilson's money and credit. Nor did Perrine, in fact, propose to restore this stock, or any part of it, to Wilson, as appears by his statement made shortly after to Mrs. Wilson, that he would never yield to Mr. Wilson's having a majority of the stock, and that "he was going to protect himself and leave Wilson in a

hole." Wilson's endorsements for the consolidated company up to this time had been in the aggregate nearly $1,600,000, and during the year 1894, up to October, was nearly $200,000. His refusal to endorse further unless he had control of a majority of the stock, and Perrine's refusal to concede this point, led to the final breach between these parties. Shortly afterwards, Perrine, still holding in his own name or controlling all of the stock of the consolidated company, issued in exchange for the City stock, except the 4,551+ shares held by Mr. Wilson, took steps to realize upon the shares he held. The first step taken by Perrine was a proposed lease by the consolidated company to the Trenton Traction Company, which was incorporated on December 7th, 1894, for nine hundred and ninety-nine years. The execution of this lease was temporarily enjoined, upon the application of Mr. Wilson, and the hearings adjourned on the application of the consolidated company, still under Perrine's direction, from December 26th, 1894, to January 8th, 1895. On or before December 26th, the plan of leasing to the traction company was abandoned, and on that day, by the agreement of that date made between Perrine and the traction company, Perrine, who is, in the agreement, stated to represent himself and also Henry P. Perrine, Mary A. Bell and Addie Slack Perrine, agrees to sell nine thousand nine hundred and forty-one shares of the consolidated stock, "now owned by him and the said persons he represents," for $24 per share—in all, $238,584— $35,000 to be paid at the signing of the agreement, when one thousand four hundred and fifty-six shares were to be assigned to the traction company, and the balance, $203,584, in three installments of $67,861.33 each, payable June 26th, 1896, September 26th, 1896, and December 26th, 1896, the deferred payments carrying five per cent. interest. Perrine, also, by this agreement, assigns to the traction company all his interest in the canceled certificates of stock of the four consolidated corporations, and his interest in the property owned by said four companies prior to consolidation, and agrees to procure from the parties he represents formal written assignments of their interest in the canceled stock and property.

It was further agreed that the remaining eight thousand four hundred and eighty-five shares should be transferred and delivered to Robert S. Woodruff, to be held by him until all the payments were made, and if default was made in payment of any installment, the eight thousand four hundred and eighty-five shares held by Woodruff and the one thousand four hundred and fifty-five shares transferred were to be transferred back to Perrine or his legal representatives. Woodruff was to give the traction company a proxy to vote on the stock held by him and the traction company to have this for one year. And it was further agreed that, upon the signing of the agreement, the resignation of at least five directors of the consolidated company should be delivered to the traction company, to be presented by it at any stockholders' or directors' meeting. On December 28th, 1894, Henry P. Perrine, Addie Slack Perrine and Mary A. Bell assigned to the traction company their interest in the canceled stock of the Trenton, Hamilton and South Clinton companies, and in their properties which they owned at the time of the consolidation, with the proviso that if defaults should be made in any of the payments required by the agreement made on December 26th, 1894, between Lewis Perrine, on his and their behalf, and the traction company, the assignment should be null and void.

On December 28th, 1894, the traction company made the first payment of $35,000, by its check to Mr. Woodruff's order, who deposited the check and gave his own check to Lewis Perrine for the amount, the latter giving to the traction company a receipt for it as the first payment under the contract. On that date the Perrine stock in the consolidated company was surrendered and new certificates issued, of which one thousand four hundred and fifty-six shares were issued to the traction company (including seven shares to each of its seven directors) and certificate to R. S. Woodruff for eight thousand four hundred and sixty-nine shares. The agreement of purchase had provided that, as far as practicable, the one thousand four hundred and fifty-six shares to be transferred on the payment of the first installment should be the shares issued in exchange for the Trenton Horse

Railroad Company stock. This was done, apparently, under the advice of counsel of the traction company, as there might be some question as to the legal incorporation of the City Railway Company, and of the one thousand four hundred and fifty-six shares first delivered to the traction company there were accordingly one thousand and ten (or one thousand and seventeen) shares issued originally for Trenton Horse Railroad Company stock and four hundred and thirty-nine for the Hamilton and South Clinton street. None of this one thousand four hundred and fifty-six shares was issued for the City stock, and on the other hand, none of certificate issued to Woodruff for eight thousand four hundred and sixty-nine shares was issued except for shares originally issued in exchange for City stock. This stock is still in Woodruff's hands, under the agreement, the delivery of it having been enjoined by orders of this court made in a suit brought by Wilson against both the consolidated and traction companies, and also against Woodruff and the Perrines. Pending this injunction, payment of interest on the unpaid principal has been made, and the payment of the principal has, by agreements, signed by Lewis Perrine, on behalf of himself and as attorney for the other vendors, been postponed until after the determination of this chancery suit, involving questions touching the ownership of the stock. Immediately after the transfer of stock to the traction company and Woodruff was made, a meeting of the directors of the consolidated company was held on December 29th, 1894, which was attended by the defendant, who was notified and who had continued up to this time as director and vice-president. Mr. Perrine and all the other six directors of the consolidated company were present, and by-laws were then for the first time adopted over the objection of Mr. Wilson. Five of the directors, being all except Mr. Wilson and Mr. Stokes, who was in the former's employ and acted for him, resigned, and five persons named by the traction company were elected in their places, Mr. Barr being elected president of the board at the first meeting; after the election and organization of the new board, Wilson and Perrine still being present, Barr said that on examination they found that Wilson owed the

company $160,000, and after some words between them, Barr said that if Wilson did not pay this amount the company would sue him.    This bill was filed in 1895, against the defendant, for an accounting, charging misappropriations of the company's funds, as above stated, and charging that these sums were taken from its treasury without the knowledge, consent or authority of its board of directors, and especially that the proceeds of the bonds were applied by defendant to the payment of the note against the objection and protest of its president.    The defendant demurred to the bill upon the ground that Perrine should have been made a party, and that the suit was for his benefit, but this demurrer was overruled upon the general ground that there was nothing shown on the face of the bill which prevented the complainant company from holding defendant for a misappropriation of its funds to his own use, without joining Perrine.    See *32 Atl. Rep. p. 1 &c.*    The defendant then answered, setting out the agreement with Perrine and his advances on the faith of it, but also alleging, in the amended answer, that the advance made to Perrine for the purchase by him of the City stock was for the use of the Trenton company, and with the intention of turning over the stock to that company, in order to effectuate the consolidation.    Defendant admits the receipt of the note as charged, the payments thereon, his receipt of the bonds, and the application of the proceeds of sale of sufficient of them to pay the balance due on the note, but sets up that all these transactions were with the knowledge, consent and authority of the officers and directors.    He then claims that the transfer of stock to the traction company is upon some trust for the benefit of Perrine, and that the terms of payment for the stock are dependent on the result of this suit.    The defendant also insists that if he is not entitled to retain the money received on the note, he is then entitled to all of the shares of the stock of the company which were issued in exchange for the shares of the City company, purchased by him, and that upon the whole equities of the case no decree can be made in favor of complainant for a return of this money except upon the condition that these shares of stock be returned to him; that for this

purpose the traction company, Woodruff and the Perrines are necessary parties, and no decree can therefore be equitably made against defendant in this suit for the return of the money and the bill should be dismissed. By the answer, the further objection was made that the complainant's consolidation was illegal, but this objection was not urged at the hearing. The receipt by defendant of funds of the complainant for the payment of the note and interest being admitted, the defence, at the hearing, was based upon four grounds—*first*, that the advances of defendant were, in fact, made to the Trenton Horse Railroad Company and constituted an indebtedness on its part to defendant, which the consolidated company was liable to pay on the consolidation as one of the debts of the traction company; *second*, that the defendant advanced the money necessary to purchase the City stock, and did the other acts necessary for the consolidation, relying upon reimbursement, according to the agreement between himself and Perrine; and that the complainant company, having in fact received the benefit of defendant's advances, by its receipt of the stock and property of the City company by the consolidation, is not to be entitled to reclaim the money without restoring defendant to the *status quo*, and inasmuch as this is impracticable, no reclamation of the money can be made; *thirdly*, that complainant's suit is practically for the benefit of Perrine, and is controlled by him, and that its purpose and practical object is to repudiate Perrine's agreement with Wilson and recover the money paid by him to Wilson under it, practically for the benefit of Perrine, and a recovery by complainant is therefore inequitable; and *fourth*, that inasmuch as any recovery should be upon the condition of a return of the stock, and this is not possible except in a suit where all the persons interested are present, no decree at all can be made against defendant in this suit, and the bill should be dismissed.

The complainant, it should be stated, does not, upon the hearing, contend that the application of its funds to the payment of the note was against the protest of Perrine. He did not appear as a witness in the cause, although kept advised by the complainant's counsel from time to time of the progress of the cause, and of the character of the evidence given.

And it further appears that all of Wilson's liabilities as endorser for the complainant or the Trenton company, have been discharged, except upon a note of the Trenton company for $3,000, which is held to secure the outstanding bonds of the Trenton company to that amount.

*Mr. James Buchanan, Mr. Robert S. Woodruff* and *Mr. Frank Bergen,* for the complainant.

*Mr. Samuel K. Robbins, Mr. David J. Pancoast* and *Mr. Samuel H. Grey,* for the defendant.

EMERY, V. C.

The case, as presented on the hearing, involves a large amount of detail in the proofs, but so far as relates to the ultimate equitable rights of the complainant and defendant, the case is one, as it seems to me, which must be determined by the application of fundamental principles of law relating to the consolidation of corporations. The act under which the consolidation was effected prescribes (*P. L. of 1888 p. 74 § 1 subd. 1*) that the agreement of consolidation shall provide the manner of converting the capital stock of each of the constituent companies into the new corporation; and as to the nature and effect of the agreement, expressly prescribes (section 1, subdivision 2) that the agreement "shall be deemed and taken to be the agreement and act of consolidation of the companies." The agreement is, therefore, the fundamental law of the new or consolidated company and of all of its stockholders who receive stock under it, and is the fundamental law in the same manner, and with the same effect, as the charter or original certificate of a corporation on its organization. No material or vital change in the terms of consolidation, as expressed in the agreement, can be made by any portion of the shareholders in their own interest, without the unanimous consent of all stockholders, and the general rule must also be that the company itself, the result and creature of the agreement of consolidation, cannot be estopped either legally or equitably from enforcing, as against all of its stockholders, the terms of the fundamental agreement.

In the present case the secret agreement between Perrine and Wilson provided in effect for other terms of consolidation in favor of the holders of City railway shares, than those expressly prescribed in the articles. In these articles the exchange was declared to be made on the basis of 14+ new shares to one City share. By the secret agreement, the owner of the City railway shares was to receive in addition, from the consolidated company, the entire cost of the purchase of these City railway shares, and this additional amount was to be secured by a pledge of the first mortgage bonds of the company. The materiality of this change in the terms of converting the City company stock is manifest. On the face of the articles, the profit of the consolidation was apparently altogether in the ownership of the City stock, which was the only stock increased or "watered," and the profit on the consolidation apparently was the increase in par value of the consolidated stock over the par value of the City stock or the amount paid for the City stock. But if the consolidated company, in addition, was to pay the holders of the City stock the cost of purchasing this stock and secure payment of this cost by lien on the property of the consolidated company, then the City stockholder received a large additional bonus on the conversion of his stock, and this bonus was made a lien on the property prior to all of the stock. Such a vital point in the terms of consolidation, as the payment by the consolidated company of the purchase-money of the stock of one of the constituent companies to the owners of this stock could not be binding or valid against the consolidated company, unless it was expressed in the articles, and so far as relates to the necessity for express provision in the articles, I am inclined to think that, under the circumstances of this case, it is immaterial whether the repayment for advances for the purchase of the City stock is to be taken as made to Wilson as the owner of the City stock or to him as a creditor of the Trenton company, for the amount advanced to it to enable it to become the owner. For although, by the act relating to consolidation, the new company is liable for all of the debts of the old companies, any debt which the Trenton company, before the consolidation, owed for advances to purchase

the City stock as its stock, would be discharged, so far as the Trenton company and the consolidated company were concerned, by the agreement itself, providing that for this City stock, so held by it, the Trenton company should receive fourteen shares to one. If in addition the consolidated company should be obliged to pay to the Trenton company, or for its benefit, the debt of the Trenton company incurred in purchasing the City stock exchanged, it is evident that this would, as between the Trenton company and the consolidated company, be a payment in excess of the amount fixed by the articles. If Wilson had not, by his participation in the consolidated agreement, as director of the Trenton and consolidated companies, fixed the terms of conversion of the stock of the City company, and if he had in fact advanced money to the Trenton company, which it had used for the purchase, simply for its benefit and not for Wilson's, the debt might perhaps (so far as Wilson was concerned) have remained, notwithstanding the consolidation, as a debt due from the Trenton company, and therefore a liability of the consolidated company. But inasmuch as the treatment of these advances for purchasing the City stock as a debt due from the Trenton company to Wilson, would be to effect, so far as the consolidated company is concerned, and as between it and the Trenton company, a vital and material change in the articles of consolidation, which Wilson himself participated in making, my present view on this point is that, in view of the failure of the articles to expressly provide that these advances for purchasing the stock of one of the constituent companies were to be paid to the owners of the stock, such payment from the funds of the company is a violation of the fundamental articles of consolidation even if paid as a debt of the Trenton company. But it is not necessary to decide this point, for as a matter of fact I find that the purchase was not made for the Trenton Horse Railroad Company, nor up to the time of the consolidation was it so treated by either Perrine or Wilson.

The agreements of March, 1893, are individual agreements for the purchase for their individual benefit only; some provisions for sharing the bonds of the company with the two other

principal owners of the Trenton company are inserted, but no provision is made for the remaining owners of the Trenton stock, and the entire stock of the consolidated company is apportioned between Perrine and Wilson, and the provision which gave the other principal owners of the Trenton company shares of the stock was stricken out by the parties at Wilson's express request. Wilson's present statements that the purchase was made for the Trenton company are so shaken by his affidavits to the contrary, and by his actions up to the time of consolidation, and indeed up to the time of filing the amended answer in this suit, that they cannot be accepted as giving the true nature of the transaction as understood between him and Perrine, in reference to this point, or as overcoming the force of their written agreement, which is consistent with all the actions of both parties under it. The entry in the Trenton company's books, crediting Wilson with $7,500 advanced on May 1st, 1891, is the only circumstance tending to show, although only indirectly, that the Trenton company claimed some interest to this extent in the purchase, but it would in my judgment be exaggerating the effect of this entry to consider it, either alone or in connection with Wilson's evidence, as establishing ownership of the entire city stock on the part of the Trenton company, or as establishing an indebtedness by this company to Wilson for the $122,400 paid by him to French for stock which was delivered, not to the company but to Perrine and then to him, in strict accordance with their written agreement. The entry in the books of the Trenton company is explainable, as it seems to me, on other grounds and on the view that the advance by Wilson of this $7,500 on account of the $135,000 fixed in the agreement, not being made directly to French, but through the Trenton company, the entry was properly credited on its books as between the Trenton company and Wilson, to show that of the $25,000 advanced on May 1st, 1891, to complete the purchase, Wilson had advanced $7,500. This, so far as Wilson was concerned, was advanced as part of the $135,000 under the agreement. Whether for this $7,500 Wilson is to be considered as still a creditor of the Trenton company, after the consolidation, will be

considered hereafter. After the consolidation, Perrine, it is true, treated the advances of Wilson as a debt of the consolidated company, not only by the entries he directed on its books, but also by his letters to Wilson and to the Central Trust Company, and Wilson also so treated them. But these entries on the books of the consolidated company, made in the private interest of Wilson and himself, stating that the advances were a debt of the Trenton company, are not sufficient to create the indebtedness in favor of Wilson, if it did not in fact previously exist. These entries and the acts of Perrine as president and sole manager in control of the affairs of the consolidated company, so far as these transactions with Wilson are concerned, manifest that this method of treating the advances as a debt of the Trenton company was the method devised by Perrine for carrying out the terms of his agreement with Wilson for repayment, the consideration of which was, to Perrine, that he should receive about eight thousand four hundred shares of complainant's stock without the payment of any money. None of the other directors of the complainant knew of the agreement while these entries on its books were made, nor do any of them, except Stokes, who was in Wilson's employ, seem to have in fact known of any of the entries in complainant's books relating to the advances by Wilson to the Trenton company, or to have known of the note in question and its payment until after it was paid.

The directors permitted Perrine to manage the whole affairs of the company, without supervision or control, and while it is true that they might, therefore, perhaps bind the company, as to third persons, by their acquiescence in Perrine's acts, yet such acquiescence cannot be treated, by Perrine or Wilson, as authority from the company for their misappropriations of its funds to their own benefit, or as authority for making admissions as to the existence of indebtedness on the part of the complainant to either Wilson or Perrine for a claim of this character.

On the whole case I fail to find any evidence sufficient to establish, as against the complainant and in favor of Wilson or Perrine, that the advances made by Wilson for the purchase of the stock were advances to the Trenton company, or were, pre-

vious to or at the time of the agreement of consolidation, so treated by either of them. In reference to the question of treating these advances as a debt of the Trenton company, another consideration of great weight is urged by complainant's counsel. If these advances were, in fact, a debt of the Trenton company, then it must be because the latter company was the real owner of the City company stock, and ·it must have been such owner in fact at the time of the consolidation. In the absence of any provision previous to consolidation, by which this stock of the City company, so belonging to the Trenton company, was prevented from passing to the consolidated company, the act relating to consolidation *ipso facto*, on the filing of the agreement, vested in the consolidated company all the existing property, franchises and rights of the Trenton company. It is claimed, and apparently with much reason, that this would include the Trenton company's interest as owner of the City stock. But, so far as relates to this branch of the case relating to the real purchasers of the City stock and the payment of advances therefor, I dispose of it without expressing an opinion upon this point, and hold, first, that the purchases were not made by Wilson for the use of the Trenton company, but for the use of himself and Perrine, under their agreements, and secondly, that the repayment to Wilson from the funds of the consolidated company of the amount he had advanced for purchasing the stock, was in violation of the articles of consolidation relating to the terms of converting the stock of the City company.

Complainant's counsel insist that the agreements between Perrine and Wilson are in themselves fraudulent and void, but the validity of the agreements as between the parties is not necessarily involved in this suit by the consolidated company, which has the right to stand on the terms fixed by the agreement of consolidation, irrespective of the private agreements of stockholders, whether these are valid or not as between the parties thereto. I make no decision, therefore, upon this point.

This withdrawal of the company's funds by Wilson for payment of his advances to purchase the City stock, being, therefore, in violation of the agreement for consolidation, the company

is entitled to recover the amount withdrawn for this purpose, unless the defences set up by way of equities are such as to deprive the company of the right to enforce the terms of consolidation against Wilson.

The *first* equity relied on is that the complainant is now the owner of the City railway property which was transferred to it, and that defendant advanced his money to purchase the City stock on the faith of the agreement for reimbursement, and without this agreement would not have made the purchase. As against Perrine, who made this agreement, this equity may, perhaps, be valid. In *Knoop* v. *Bohmrich, 4 Dick. Ch. Rep. 82,* there was alleged to be a private agreement between the complainant and another stockholder before the organization of a corporation, that the property of the latter should be taken in payment of his stock at a valuation which, as against the corporation itself, was excessive. Vice-Chancellor Van Fleet said (at *p. 84*) that though the corporation might not be bound by the contract, the complainant would, in equity, be bound by the preliminary contract, to the extent of depriving him of the right to maintain an action in equity on behalf of the company to compel the stockholder to pay for his stock in a different manner. But the vital question in the present case is whether this equity of the defendant, if it exist, is an equity with which complainant is chargeable by reason of its ownership of the City road. And the insuperable obstacle, as it seems to me, in the way of imposing any such equity on the present complainant, is that the entire terms upon which complainant was to receive the conveyance of the City road, and the payments it was to make for this conveyance, were fixed by the articles of consolidation which were agreed to by defendant. This consideration was, as fixed by these articles, the issuing of shares of its stock in exchange for the City stock at the proportion specified. And it is clear, I think, that these terms thus expressly fixed by fundamental articles, covered the entire subject of the transfer of the City road to complainant and payment therefor, and must exclude and prevent the addition of further payments in consideration of the conveyance.

As against the complainant corporation, who has paid the full price stipulated by the articles for the City road and for the City stock, I can see no basis upon which the defendant can have any equity to require it to pay an additional sum. The defendant, after consolidation on the basis adopted, certainly could not, as plaintiff or complainant, have compelled the company to pay any additional price to reimburse him for his advances; nor can I see how the fact that he has obtained the amount of the advances from the company in violation of the articles can have the effect of imposing an equity on the complainant to pay this additional price. This case does not, in this respect, come within the class of cases cited by defendant's counsel, where, on the repudiation of an illegal or void contract by a complainant who is a party to the illegal contract, the complainant is obliged to restore the consideration or make other equitable compensation for benefits received. The question here is whether a complainant having paid the full price stipulated by a valid contract, must pay more, or allow defendant to take more from its funds, under a secret agreement, to which complainant was no party and by which it cannot be bound. Nothing less than the unanimous consent of the complainant's stockholders to the withdrawal of its funds for this purpose, would, as it seems to me, be sufficient to authorize it and to operate as a defense to the recovery in equity. Nor am I now prepared to say that even such unanimous consent of those who are stockholders at one particular time, would be sufficient to estop the corporation itself forever. The withdrawal here was in violation of the fundamental articles, and I am inclined to think that the only way in which it could become permanently effective as against the corporation was by an amendment to the articles, by unanimous consent. But this question is not involved as to the withdrawal, for no knowledge of this secret agreement between Perrine and Wilson on the part of any of the other stockholders or directors is shown, nor any consent on their part to the withdrawal of the funds of the company for that purpose. The fact that Stokes, the director who was in Wilson's employ, knew of the entries on complainant's books in which the note was carried as a debt of the consolidated

20

company, and that the other directors might have seen these entries, does not estop these directors or the company through them, for, even if they are to be charged with knowledge of these entries, the fact that the entries, which were made by Perrine's direction for his and Wilson's benefit, did not disclose the real character of the debt, but were made in such manner as to indicate a *bona fide* debt of the consolidated company, and the absence of actual knowledge on their part of the origin and nature of this debt, prevent the creation of an estoppel against them or the company by reason of allowing the payments. *2 Spell. Prov. Corp.* § *636,* and cases cited. But whether the directors were personally estopped as stockholders or not, by reason of allowing or not preventing these payments on the note, the corporation itself is not estopped from insisting on its full rights under the consolidation agreement, unless all of the stockholders are estopped. The corporation, in an action of this character, represents the right of every stockholder, and if there is any stockholder who has the right to call upon the corporation to enforce this corporate right, even though it be against all the other stockholders combined, the corporation itself must certainly have the right to bring the action on its own behalf. It is here the corporate right which is to be enforced, either by the action of the corporate authorities, or, if they refuse, then by the individual stockholders prosecuting a corporate right for the benefit of the corporation itself. Inasmuch, therefore, as the defendant has failed to show an estoppel or acquiescence by all of the complainant's stockholders in the withdrawal of these moneys by him, and with knowledge on their part of the substantial character of the debt for which they were withdrawn, I am obliged to hold that there is no equity, as against the complainant, which estops it from setting up that the full price to be paid for the City road was the price fixed by the articles, or which estops it from recovering the amount, in addition to this price, which has been taken from its funds by defendant.

The *second* equity or defence set up against the recovery is, that this suit is practically controlled by Perrine and is really brought for his benefit, and is, therefore, substantially a pro-

ceeding by which he is enabled to get the full benefit of Wilson's advances, while repudiating his own express agreement that they should be repaid, and his own official acts as president in procuring the payment from the company's funds.

As to the *bona fides* of the transfer of the stock, the allegation of the answer is, that by the agreement for sale of the stock, the terms upon which the traction company were to become the owners of the Perrine stock, were to depend upon the result of this suit, which was to be brought at once. The agreement and the other evidence relating to the purchase, which I have stated above, and which appear affirmatively to be the only agreements between Perrine and the traction company on the subject, show, in my judgment, that these allegations of the answer are not sustained, but that the purchase of the stock is *bona fide,* and that the suit is not in fact controlled by Perrine, or prosecuted for his benefit. In this position of affairs as to the purchase of the Perrine stock and payment therefor, it does not seem to me that there is any basis of equity for depriving the complainant of its right to recover its funds improperly taken by defendant, by reason of the relation of Perrine to this suit. The remaining equity set up by defendant is his right to have equitable terms imposed as a condition of the decree for complainant.

These terms sought to be imposed as the equitable condition of recovery are, that Woodruff and the traction company should thereupon transfer to the defendant the stock of the consolidated company, representing and issued in lieu of the stock of the City company purchased by the defendant's money. This original City stock was purchased principally, but not entirely, by the use of defendant's money, and he advanced about $130,000 of the entire $160,000 and over required for the purchase. To raise the balance, over $30,000, the Trenton company contributed cash and its obligations, a large part of which have been satisfied by complainant. Defendant held the stock nominally as collateral, perhaps as purchaser or owner, and when he surrendered the stock, defendant seems to have supposed in good faith that the bonds of complainant which he had taken as collateral were valid and effectual securities in his hands for the purpose of securing repayment

of his advances.   If these bonds are held to have been improperly deposited for this purpose, and the defendant is obliged to restore the proceeds thereof applied to the payment of his advances, it is strongly and very forcibly urged by counsel for defendant that the decree for recovery should go only on the condition of restoring the City railway stock to defendant.   As against the persons chargeable with the creation of the situation which gives rise to the equity, and chargeable with the duty of returning the stock, this equity might be enforceable, but the obstacle to imposing the performance of this equity on the complainant is insurmountable.   The complainant is not in any way responsible, either equitably or legally, for the position in which defendant finds himself, by reason of carrying out the secret agreement between Perrine and himself, to take from its funds the advances made to purchase the stock of the constituent company, nor is it responsible for Perrine's retention or control of the stock issued in exchange of the collateral City stock.   The equity to a return of the shares, either absolutely or as security for the advances, if it exists, is an equity in favor of Wilson against Perrine and his assignees of the stock, and is the result of Wilson's dealings with Perrine in carrying out a private agreement for consolidation, which was, so far as these advances were concerned, in violation of the actual consolidation agreement adopted and filed. The company, as above stated, is legally and equitably entitled to have the consolidation agreement, which is its only agreement on the point now in issue, carried out.   And the enforcement of these provisions of this fundamental agreement as to the terms of converting stock, can neither be changed directly by allowing defendant to retain money taken in violation of them, nor indirectly, by refusing their enforcement except upon the terms of enforcing also an equity which defendant has or may have against Perrine, by reason of their joint violation of the articles, and Perrine's alleged inequitable appropriation, as between him and defendant, of the shares issued by the company and received by Perrine for himself and Wilson or for Wilson, as the full purchase price which complainant was to pay under the articles.

The complainant having issued the City stock in strict pursu-

ance of the provisions of the consolidation, has obviously no longer the power to control the delivery of this stock, whether in Perrine's hands or otherwise, and to hamper its right to recover funds withdrawn by a director by a condition precedent, that it should return stock rightfully issued, so far as the complainant is concerned, seems to be an inequitable rather than an equitable condition, and it should not therefore be imposed. No such terms, of course, could practically be imposed in a suit to which Perrine and his assignees were not parties, but the real force and bearing of this contention as to terms is, that in view of the entire equities between the parties to the suit, disclosed by the entire proofs in the case, no equitable decree can be made in complainant's favor except upon these terms, and inasmuch as these terms can only be imposed in a suit to which all these persons are made parties, the complainant, therefore, as is urged, is entitled to no decree at all in the present suit, but must file a bill making all these other parties defendants, in order that the equities of all parties in the entire case may be reached. I have, therefore, considered the imposition of equitable terms in this view, and hold that, so far as the complainant is concerned, there is, on the whole case, no equitable obligation on its part to return this stock to Wilson, which can or should be enforced by way of imposition of terms or otherwise; and that as between complainant and Wilson, the whole equities of the case, so far as relates to the return of Wilson's advances, are fully disposed of without any adjudication as to Wilson's equities arising, by reason of such recovery, upon Perrine's ownership of the disputed stock or its proceeds. No principle relating to the consolidation of corporations is to be more strictly and inflexibly applied than the rule that secret agreements for terms of consolidation, other than those prescribed by the agreement of consolidation, cannot be enforced against the company, directly or indirectly, for the benefit of any portion of the stockholders. Any relaxation of the rule would, as it seems to me, tend directly to make the consolidation of companies convenient instruments of fraud. The defendant, therefore, must account to the complainant for its funds withdrawn to pay the $130,000, to the extent that this note

represented or was based upon the consideration of moneys advanced by defendant for the purchase of the City stock. , This will include the $122,400 directly advanced by defendant to French, and which was, in the view taken above, no liability of the consolidated company.

As to the $7,500 advanced by Wilson to the Trenton Horse Railroad Company, he became by this advance of cash to that company *prima facie* a creditor to that amount, entitled to be repaid by it or by complainant, as any other Trenton company's creditors would be. This money so advanced by Wilson to the Trenton company was, however, used by Perrine, its president, with Wilson's consent, to assist in paying the balance of the purchase-money on the City stock, and the precise question as to the status of Wilson to the Trenton company, in reference to this advance, is whether the subsequent use by the Trenton company of the money advanced by Wilson to it, for Wilson's benefit in part, by paying it on stock of which he was the owner or in which he had an interest, is sufficient to disentitle Wilson to recover the advance as a debt due to him from the Trenton company, and from the complainant as his successor, for which he was entitled to be paid from the company's funds.

My opinion is that Wilson is not to be treated as a creditor for this advance of $7,500, even though he was so credited in the Trenton company's books, for the reason that the Trenton company seems to have advanced at least this amount of money from its own funds for the purchase of the City stock, and all of this stock was subsequently delivered to defendant, who held this stock for the reimbursement of all his advances, including the $7,500. It appears, therefore, that the Trenton company has discharged its liability to defendant for the $7,500 by using it for the purpose for which it was advanced, and by giving defendant the entire benefit of the sum advanced. In other words, the advance to the Trenton company by Wilson is to be treated as an advance for a special purpose which has been fulfilled by the Trenton company for Wilson's benefit, and the advance, therefore, cannot be recovered.

As to the $2,000 advanced in August, 1891, this was an

ordinary debt of the Trenton company due for operating expenses, and was payable by complainant as any other debt of the Trenton company. The $1,900 payment made in November, 1891, by complainant to defendant, should be applied to this indebtedness, and for the balance defendant should be allowed on- the account.

Complainant may give notice of motion to settle decree, and on this motion I will hear and dispose of any remaining questions as to the account which are left in dispute.